■ Sandra Kaplan, M.D., Appellant, v Rache Simmons, M.D., et al., Respondents. [774 NYS2d 142]—

---

Judgment, Supreme Court, New York County (Ira Gammerman, J.), entered February 8, 2002, which, insofar as appealed from as limited by the briefs, dismissed plaintiff's informed consent cause of action pursuant to a trial ruling that dismissed such cause of action before the case was submitted to the jury, affirmed, without costs.

On or about August 1, 1995, a small nodule beneath plaintiff's right breast was diagnosed as angiosarcoma, a rare skin cancer believed to have resulted from radiation treatments previously administered for plaintiff's breast cancer. On August 9, 1995, plaintiff's surgeon, defendant Michael P. Osborne, M.D., treated the angiosarcoma by removing a portion of plaintiff's breast (a quadrantectomy) rather than removing the entire breast (a mastectomy). Unfortunately, angiosarcoma reappeared in plaintiff's right breast, and in June 1996, a mastectomy was performed. It is undisputed that plaintiff was free of angiosarcoma from the time of the 1996 mastectomy through the time of the trial, in October 2001.

In this action, plaintiff asserted two theories of liability against Dr. Osborne based on that physician's August 1995 treatment of her angiosarcoma by quadrantectomy, rather than mastectomy. The first theory of liability was submitted to the jury as the question, "[W]as Dr. Osborne negligent in not performing a mastectomy in August 1995?" The jury's unanimous answer to this question was "No." Plaintiff's other theory of liability based on the events of August 1995 was that Dr. Osborne had failed to obtain her informed consent before performing the quadrantectomy. It was plaintiff's contention that Dr. Osborne failed to inform her that the preferred treatment for her angiosarcoma was a mastectomy, a treatment that would have left her with a smaller risk of recurrence of the disease than did the quadrantectomy. The trial court's refusal to submit this "informed consent" claim to the jury is the sole ground on which plaintiff seeks reversal of the judgment dismissing her complaint.

In seeking to have this case remanded for a trial of her informed consent claim, plaintiff overlooks the fact that the jury, in exonerating Dr. Osborne of malpractice, necessarily rejected plaintiff's claim that Dr. Osborne failed to obtain her informed consent to the quadrantectomy. Defendants' expert witness, surgical oncologist Dr. Daniel F. Roses, testified that, although he understood a mastectomy to be the "generally recommended" treatment for breast-related angiosarcoma, a

quadrantectomy would be a reasonable alternative if that is what the patient desired *"after appropriate consultation and a recognition of the potential for recurrence"* (emphasis added). Thus, the defense position at trial was that a quadrantectomy was within applicable standards of medical practice if, and only if, the patient chose that treatment after being fully informed that a quadrantectomy carried with it a greater risk of recurrence of the disease than would a mastectomy.[1] The record is devoid of expert evidence that would support the defense verdict on the issue of malpractice if the jury had found that plaintiff was *not* fully informed of the relevant risks and alternatives when she consented to the quadrantectomy. Therefore, in determining that Dr. Osborne had not been negligent in performing the quadrantectomy, the jury necessarily found that, contrary to her trial testimony, plaintiff in fact had been fully informed when she consented to that operation. Accordingly, a jury has already determined in Dr. Osborne's favor the very same issue raised by plaintiff's informed consent claim, namely, whether plaintiff gave informed consent to the quadrantectomy. Under these circumstances, to the extent the trial court may have erred in summarily dismissing the separate (and, in this case, redundant) informed consent claim, such error was entirely harmless.

It bears emphasis that the record fully supports the jury's determination that plaintiff gave her informed consent to the quadrantectomy. To begin, plaintiff—who, as a psychiatrist, is herself a medical school graduate and physician—admits that she discussed with Dr. Osborne and at least one other physician (Dr. Peter Pressman) the option of treating her angiosarcoma by mastectomy. Further, the jury heard evidence flatly contradicting plaintiff's uncorroborated testimony claiming that, before the quadrantectomy was performed, no one had explained to her that a mastectomy was the medically preferred treatment for her disease.

For example, on August 8, 1995, plaintiff met with oncologist Dr. Karen Antman to receive a second opinion. Dr. Antman's written report of the consultation, which she dictated three days after the meeting occurred, states: "She [plaintiff] does not want the standard simple mastectomy for this disease." In deposition testimony that was read into the record at trial, Dr. Antman elaborated on what she discussed with plaintiff:

---

1. By contrast, plaintiff's expert witness, pathologist Dr. John J. Shane, took the position that a mastectomy was the only acceptable treatment for angiosarcoma in the breast area, even if a fully informed patient preferred a quadrantectomy. The jury obviously rejected Dr. Shane's testimony on this point.

"I brought up a mastectomy once or twice until it was obvious she was not going to do it. Then we started talking about alternatives. It probably took no more than three or four minutes to discuss what we could do if a mastectomy was not possible. . . .

"She said she was not having a mastectomy. I told her it was the standard of care. It was quite clear that she wasn't going to have a mastectomy.

"So, then we tried to figure out what kind of operation we could do where we could get a decent margin around the tumor . . . ."

In the face of Dr. Antman's disinterested testimony, plaintiff simply denied that Dr. Antman had ever discussed the possibility of a mastectomy with her.

Plaintiff also claimed that surgeon Dr. Michael Moore, another consulting physician she saw before the quadrantectomy was performed, failed to discuss the option of a mastectomy with her. When plaintiff was confronted with the statement in Dr. Moore's report that he had "[d]iscussed complete removal" with plaintiff, she attempted to reconcile her position with the report by testifying that what Dr. Moore had discussed with her was a "complete skinning" of the chest, not removal of the breast itself. There was no expert testimony at trial to the effect that such a "skinning" operation was a recognized treatment option for plaintiff's disease.

Dr. Osborne, like Dr. Antman, testified that plaintiff was firmly opposed to undergoing a mastectomy. Dr. Osborne testified that, although he had advised plaintiff that a mastectomy was one of the treatment options for her angiosarcoma, plaintiff "refused to consider the option of mastectomy." Dr. Osborne also testified that, on August 4, 1995, he advised plaintiff that the consensus of the medical conference that reviewed her case prior to the surgery was that "a quadrantectomy was reasonable and an acceptable route to go *in the light of the fact that she was not wanting to go the route of mastectomy*" (emphasis added).

Dr. Peter Pressman was another physician whom plaintiff consulted between the angiosarcoma diagnosis and the surgery. In a letter to Dr. Osborne, dated August 8, 1995, Dr. Pressman wrote that, although he did not feel that the planned quadrantectomy was contraindicated, he still believed that "a total mastectomy should be carried out." Dr. Pressman concluded his letter with the observation that "this [the desirability of a mastectomy] will need to be *re-discussed* with the patient as she acquires more information from additional consultants"

(emphasis added). Again, plaintiff claimed at trial that the contemporaneous medical record was inaccurate to the extent it indicated that the medical preference for a mastectomy had been discussed with her prior to her surgery.[2]

Plaintiff's uncorroborated and self-serving testimony may have been sufficient—albeit barely sufficient—to create a triable issue as to what she was told prior to her surgery. The critical point missed by plaintiff, however, is that a jury has already been presented with that issue and has resolved it, based on the clear preponderance of the evidence, in Dr. Osborne's favor. Again, the testimony of defendants' medical expert was, in substance, that a quadrantectomy was within applicable standards of practice as a treatment for plaintiff's disease only if the patient chose a quadrantectomy after being informed of all relevant risks and alternatives. The jury, after hearing all the evidence, found that Dr. Osborne did not commit malpractice in performing a quadrantectomy rather than a mastectomy, meaning that the jury must have concluded that plaintiff chose to undergo the quadrantectomy after (in the words of defendants' expert witness) "appropriate consultation and a recognition of the potential for recurrence." There is no reason to require a new jury to resolve a question that a prior jury has already answered. Accordingly, the judgment is affirmed. Concur—Saxe, J.P., Sullivan, Williams and Friedman, JJ.

Lerner, J., dissents in a memorandum as follows: I respectfully dissent and would reverse the judgment, reinstate the cause of action for lack of informed consent and remand the matter to Supreme Court for trial of this cause of action.

Following a routine mammogram in 1992, plaintiff Sandra Kaplan, M.D. was diagnosed with breast cancer and referred to defendant Michael P. Osborne, M.D., who performed a lumpectomy and recommended a course of radiation and chemotherapy. In February of 1995, plaintiff developed a small red "pimple" under her breast, which was later diagnosed by Dr. Osborne's associate, defendant Rache Simmons, M.D., as a benign inclusion cyst. The "inclusion cyst" began to change in color and, in April of 1995, plaintiff consulted Dr. Osborne, who agreed with Dr. Simmons's diagnosis and was unwilling to perform a biopsy. In July of 1995, at plaintiff's insistence, Dr. Osborne biopsied

---

2. In regard to plaintiff's position on the advice she received on the mode of treatment to be pursued, it seems pertinent to recognize an inherent anomaly. If, as plaintiff testified, she was already determined (based solely on Dr. Osborne's recommendation) to have a quadrantectomy at the time she consulted with Drs. Antman, Moore and Pressman, the question arises why she was seeking a second opinion.

the cyst, which was determined to be an angiosarcoma, a rare but aggressive form of skin cancer caused by radiation therapy. Although this type of cancer was not well recognized by oncologists prior to the 1980s, Dr. Osborne was well versed in its diagnosis and treatment, insofar as he and Dr. Simmons had coauthored an article on angiosarcoma in 1994.

Plaintiff had a morbid fear of cancer from the time of her mother's early death from breast cancer. Moreover, plaintiff's sister had recently died from ovarian cancer, after which plaintiff opted to have her own ovaries prophylactically removed. After diagnosis of the angiosarcoma, plaintiff informed Dr. Osborne that she was willing to undergo a bilateral mastectomy, also as a prophylactic measure, to reduce the risk of metastasis. Dr. Osborne, however, recommended a quadrantectomy, a surgical procedure in which only one quarter of the breast, containing the angiosarcoma, is removed. Dr. Osborne performed the quadrantectomy in August of 1995. By May of 1996, the angiosarcoma had returned and had spread to the underlying breast tissue. A mastectomy was performed by another doctor.

Plaintiff subsequently commenced the instant action against Dr. Osborne and Dr. Simmons, asserting claims for medical malpractice and lack of informed consent. In particular, plaintiff alleged that Dr. Osborne failed to inform her of the aggressive nature of her disease, and of the risks and benefits associated with the quadrantectomy procedure. She also alleged that Dr. Osborne failed to disclose any alternative treatments for angiosarcoma, specifically mastectomy, thereby departing from accepted standards of medical practice.

During the trial of this matter, on the afternoon prior to summations, the trial court dismissed plaintiff's cause of action for lack of informed consent sua sponte. The jury was not charged on informed consent, and only the cause of action for medical malpractice was submitted for its determination. The jury returned a verdict in defendants' favor and a judgment was thereafter entered, dismissing the complaint.

It is well settled that in order to recover damages for medical malpractice based on a lack of informed consent, the plaintiff must prove that the person providing the professional treatment failed to disclose to her the material risks, benefits and alternatives to the surgery which a reasonably prudent medical practitioner under similar circumstances would have disclosed, permitting the plaintiff to make a knowledgeable and informed decision. The plaintiff must also prove that a reasonably prudent person in his or her position would not have undergone the surgery at issue had he or she been fully informed, and that the

lack of informed consent is a proximate cause of the injury or condition for which recovery is sought (Public Health Law § 2805-d [1], [3]; *Nieves v Montefiore Med. Ctr.,* 305 AD2d 161, 164 [2003]; *Romano v Colen,* 305 AD2d 575 [2003]; *see Davis v Nassau Ophthalmic Servs.,* 232 AD2d 358 [1996], *lv denied* 89 NY2d 814 [1997]).

Although a lack of informed consent must be supported by expert testimony as to whether the disclosure given was insufficient, no expert testimony is required to demonstrate that a reasonably prudent person in the plaintiff's position would not have undergone the surgery in question if he or she had been fully informed of the risks and benefits (*Osorio v Brauner,* 242 AD2d 511 [1997], *lv denied* 91 NY2d 813 [1998]). On this issue, plaintiff's testimony that she would not have agreed to the quadrantectomy had she been fully informed of the risks of recurrence, and her expert's testimony that a mastectomy was the standard of care for treatment of angiosarcoma, were sufficient to present a question of fact requiring a determination by the jury as to whether a reasonably prudent person in plaintiff's position would not have agreed to the quadrantectomy (*id.*).

Viewing the testimony adduced at trial in the light most favorable to the plaintiff, I submit that the trial court erred in summarily dismissing the cause of action for lack of informed consent. Evidence was presented that Dr. Osborne, as an author on the subject, was well aware that mastectomy, rather than quadrantectomy, was the standard of care for the treatment of angiosarcoma, and that he failed to disclose this information to the plaintiff. In fact, he testified that he never discussed with plaintiff the aggressiveness of angiosarcoma, but relied on others to do so. His testimony that plaintiff had previously informed him that she would not undergo a mastectomy was refuted by her testimony that, in light of her family's medical history, she was willing to undergo any medical procedure, no matter how drastic, to prolong her life, and that she had demonstrated same by having her healthy ovaries removed after her sister's death from ovarian cancer. This question of fact was for the jury, not the court, to determine.

While the majority concedes that plaintiff's testimony may be sufficient to create a triable issue of fact for the jury, it goes on to further submit that the jury, in finding defendants free from liability due to their alleged malpractice, must necessarily have also determined the issue of informed consent in defendants' favor without that issue being presented to it. Such an inferential conclusion is not supported by the trial record or by the absence of an appropriate instruction by the court.

In view of the foregoing, I submit that it cannot be found as a matter of law that plaintiff failed to establish that the consent was qualitatively insufficient, or that a reasonably prudent person in her position would not have undergone a mastectomy had she been accurately informed of her medical condition.